Livingston, J.
delivered the opinion of the court. It is matter of surprise that questions, which must frequently have occurred in so commercial a country as Great Britain, and where so large a capital is employed in insurance, have not been decided in any of her courts. We must therefore, endeavor to discover what is reasonable and most conformable to the ancient laws and usages of other commercial nations; for, where precedents are not to be found, the practice of such countries may be deemed the best guide on the subject of maritime law.
We are, then, first, to determine whether wages and provisions, during a detention after capture, form a general average, or fall on the freight only ?
When it is considered that capture is a disaster which generally happens without fault of the owner of goods or vessel, but by superior force, against which no human precaution can always provide, and that the expenses, here in dispute, are incurred in consequence of this vis major, or casus fortuities, and for the common benefit of all, it is not easy to assign a reason why they should be borne by one of the' parties in misfortune rather another. Of little advantage would it be to claim a valuable property, *723 after ^capture, unless the mariners remained for [*576] the purpose of proceeding to the port of discharge in case of liberation. It would otherwise, if acquitted, be exposed to perish, or be sold at great disadvantage. It was said on the argument, that the master was not obliged to detain his - crew. Whether it be compulsory on him. to Eo so or not, is of no moment. It is sufficient that he has done it in the present ease; that he has acted with good faith, and that such detention was manifestly for the general weal. It may well be doubted, however, whether it be not obligatory on him to keep them, at least, a reasonable time; for, idle would it be, in many cases, to labor for a recovery of the property unless it could afterwards be conveyed to its intended port. The cargo, in this case, might have been sacrificed in England, if the crew had been immediately discharged. Nor is it just, as it- respects this useful class of men, instantly to dismiss them in a foreign country after an accident of this kind, without affording them an opportunity of knowing the fate of the property, and a chance of defending and receiving their wages. At any rate, the objection comes awkwardly from any of those who have arrived a certain benefit from the detention of this crew, without which there would probably have been a total instead of a partial loss. But without recurring to first principles, or searching for precedents, it is not matter of contract between the different classes of underwriters to regard expenses of this kind as a subject of general contribution ? • Every policy contains a clause that “ in case of loss or misfortune, if it shall be necessary for the assured, his factors, servants or assigns, to sue, labor and travel for, in and about the safeguard and recovery of the property,” the several underwriters “ promise to contribute to the charge thereof, according to the quantity of the sum by them insured.” Now, if a charge for exiru wages and provisions be one, as it certainly is, which accrues in', consequence of the labor and travel thus enjoined, and be' absolutely necessary to give *724 effect to such pursuit, the parties to the differ en tinsurances have consented to its being apportioned among them.
In conformity with this_ stipulation is the practice of most of the commercial nations whose usages are known to us.
*Bicard, who treats of the commerce of Amsterdam, and after him Beawes, in his Lex Mercatoria, says, “ If a ship be taken by force and carried into some port, and the men remain on board to take care of and reclaim her, the wages and expenses of the ship’s company, during the arrest, shall be brought into general average.” Page 150. For this rule the author just cited assigns this very obvious reason: “ As the crew,” says he, “ remained on board, during an endeavor to reclaim her, these expenses were occasioned with the sole view of preserving the ship and cargo for their proprietors.”
In England it is settled, that if a ship be obliged to put into port to repair, and this be necessary for the safety of all, the charges of unloading, reloading and taking care of the cargo, and also the wages and provisions of the workmen hired to repair her, become a general average. Da Costa v. Newman, 2 D. & E. 407. The accident in the case of Da Casta v. Newman had happened to the ship alone, and might, ;n some measure, have been owing to her feeble or impaired condition. It would have been more reasonable, therefore, that her owner, or underwriter, should have defrayed all these expenses himself, than in cases where the peril falls at once, as well on the goods as on the vessel, without room to impute fault or neglect to the owner of either. In such a case, then, it can hardly be doubted that the court of king’s bench, to be consistent, would consider every consequential expense for the preservation of the whole, a general average. In Da Costa and Newman, the crew having been dismissed before the vessel was repaired, it became unnecessary to decide by whom a charge for seamen’s wages and provisons was to be borne.
In France the extra wages of a crew, when a vessel puts *725 into port and remains there to avoid an enemy, are a gross average. 1 Bmerig. 556. The same author informs us that all bona fide expenses, to obtain the release of a vessel, become a general average, (Vandenheuvel v. United, Ins. Co., 1 Johns. Rep. 406,) if the property be released ; and, after quoting the same passage from Ricard, which has been cited from Beawes, he observes that in ^France, [*578] the question has • uniformly been thus decided whenever it occurred. Ibid. 631.'
As we are of opinion, therefore, that the sums expended in this way, during a detention which follows a capture, are to be reimbursed ratably by all,(a) the second question may be considered as also disposed of, and we will next Bee,
*726 If, in the present instance, the underwriters on 1ke freight are to pay eight ninths of the sum assessed on that article, and those on the ship the other ninth; or,- whether the former are to pay such part as accrued before the abandonment, and the latter what arose between the abandon ment and the time of her release ?
According to a decision of this court, in the ease of the United Insurance Company against Lenox, the underwriters on the freight are entitled, in virtue of the abandonment, to all the Sophia’s earnings previous to her capture; that is, to eight ninths," and those on the ship to the remaining ninth. Hence a difficulty is supposed to occur to apportion the part of the average which falls on the freight, among those two classes of assurers. The apportionment, although a little more complex, is, nevertheless, easily made. As all freight would probably have been lost, in consequence of the capture, if the property had been condemned, the underwriters on freight and on vessel being severally entitled to eight ninths and one ninth thereof, such was the ratio of their respective interests in this subject while in the admiralty. It therefore follows, that in the same proportion should they contribute, as it respects the freight, to the expenses of reclaiming it, regardless as to how much had accrued antecedently, and how much subsequently, to the day of abandonment. By a restoration of the property, the insurers on freight receive eight ninths, and those on the vessel one ninth. Nothing, there *727 fore, can be clearer than that the expenses, as they relate to this article, must be defrayed by them in like porportion.
The last point submitted respects the matter of calculating the average. Is it to be on the first cost of the cargo or on its value abroad, and how are the vessel and freight ■to be appraised?
*It is difficult to adopt any rule, suffieintly cer- [*579] tain and yet free of every exception.
In an average arising from jettisons, the English practice is, to. regulate the contribution by the clear price which the goods would have yielded at the port of destination, “ it being equitable,” says Abbott, “ that the person whose loss has procured the arrival of the vessel should be placed in the same situation with those whose property has reached its. port in safety.” Abbott, 262. If all the goods, as well those which arrive as those which have been cast into the sea, are to be estimated at their foreign value, the result will be nearly the same, provided there be an equal advance on all, as if the first cost be jesorted to as the standard of their worth. I cannot, therefore, perceive much force in the reason assigned by the learned author in favor of this mode. With regard to vessel and freight, various regulations have been established by different states as to the decree in which they shall be liable to contribute, which only show how impossible it is to find any rule that shall operate universally and with equal justice on the different persons concerned. In England, Marshall, following Molloy, and speaking of jettisons,. says, the ship contributes for her full value at her port of delivery, and the freight pays according to its value at the same place, after deducting seamen’s wages and certain other charges. Marshall, 467. I cannot subscribe to the equity of this mode of adjustment, as it relates to the vessel and freight. Pothier, in his Treatise on Maritime Contracts, also exclairns •against it. “ As the freight,” says he, “ is only due to the owner of a vessel, as a kind of indemnity for her deterio *728 ration and expenses incurred by the voyage, it is subject ing him to .a double burden to make him contribute for the entire value of the vessel and of the freight. Our ordinance, “ therefore,” says he, “ has adopted the middle course of making him contribute for one half of the value of each.” Vol. 2. n. 119, p. 411, Other states make the vessel contribute for half her value and one third of her freight. Marsh. 467. As the rule is not accurately defined by the law of England, and the one adduced applies to cases of jettison only, we are at liberty to make [*580] one for ourselves. The injustice of *making the ship and freight contribute for their full value has already been stated. The first will be injured by the voyage, and oftentimes the whole freight received will not be equal to the expenses and disbursements to which the owner has been exposed. Valuing the property at the port of discharge is also liable to difficulty and embarrassment. In many cases of a contribution, the vessel may not reach her port, which would have been the case here if she had been condemned; and if she does, the vessel is very rarely sold there, and some calculation must always be necessary, to exhibit what are the net sales of the cargo. It will, therefore, be a rule less liable to objection, will suit the greatest .number of cases, and not be affected by the fluctuations of markets or other contingencies, and certainly most easy of practice, always to value the goods at • the invoice price, that is, at their first cost, without regard to their price abroad. What value to put on the vessel and freight, to do complete justice, is more difficult, perhaps impracticable. To take their full worth will not do. After the best reflection we have been able to bestow on the subject, we are for valuing the vessel at four fifths of her original cost, reckoning nothing for provisions or wages paid in advance; and the freight at one half of the gross sum agreed to be paid. This rule may be deemed arbitrary; so will any other that can be devised; and yet, perhaps, it will come .as near as any other in producing a contribution in pro* *729 portion to the real interest of each which may be in jeopardy. It is seldom a vessel will sell for more, after a voyage, than four fifths of what she cost, and, of course, the owner is not more than that a gainer by her being released: so, neither will his freight clear to him more, if as much, as one half which is contracted to be paid. The same course of adjustment must be pursued between underwriters.
Upon the whole, therefore, our judgment is that the mariners’ wages and provisions, (Penny and Scriber v. N. Y. Ins. Co., 3 Caines’ Rep. 155,) from the time of the Sophia’s capture to the day of her leaving Ramsgate, (it not appearing that she remained there unnecessarily after her liberation,) be added to the other expenses of reclaiming the property ; and that this aggregate sum be paid by the several underwriters on-„the vessel, cargo and freight. That in ascertaining *the proportion or [*581] amount of their respective contributions, the cargo must be valued at its first cost and charges at the port of departure; the vessel at four fifths(a) of her actual value, at the same place, exclusive of outfits and without regard to any valuation in the policy ; and the freight at one half of what was agreed to be paid at Havre. That the underwriters on freight pay eight ninths of the sum which, on this calculation, shall fall on the freight; and those on the ship the whole of the contribution which shall belong to her, and also, one ninth of that which is to be borne by the freight; and those on the cargo the residue.
Judgment accordingly.

 Expenditures during a voyage, bona fide and necessarily incurred for the common benefit of ship, freight and cargo, seem to fall within the principle of voluntary sacrifices for the preservation of all, and to be subjects of general average. It has been strenuously and frequently urged, that wages and provisions are to be charged exclusively to freight; because the freight is calculated on an estimated expense in these items according to the probable duration of the voyage, and is of course a compensation for their .mount. In case of an overvaluation by circumstances which shorten tl:o passage, there is no refunding; therefore, in case it be, from accidents which prolong the voyage, underrated, it has been thought there ought not to be a-, contribution. But this reasoning proceeds on false grounds; the calculation of freight is made upon the supposed length of an uninterrupted voyage; at all events, the inference has been superseded by the equitable rule of qni sentit commodum, sentiré debet et onus. Therefore, for not only wages and provisions, but for the expenses of loading and unloading, including port charges during a hostile detention, ship, freight and cargo must unite according to their several proportions. Sharp v. Gladstone, 7 East, 24 Nor is it to. cases of capture or hostile seizure that contribution for wages and provisions is confined. On the principle above laid down, they are subject's of general average, from the first moment that a vessel, in consequence of injury, from the perils of the sea, bears away for a port of necessity to refit, to the time of her sailing on the voyage of destination, Walden v. LeRoy, 2 Caines’ Rep. 263, and so are loading, unloading, and all other expenditures induced by the necessity. Henshaw v. Mar. Ins. Co., ibid. 274 The person entitled to contribution may recover from the person liable to con'.tibute, Walden v. LeRoy, 2 Caines’ Rep. 263, and he from his insurer; Barber v. Phœnix Ins. Co., 8 Johns. Rep. 307, though the assured may recover in the first instance the whole of his average loss from his own underwriter, and *726 leave him to recover over. Maggrath & Higgins v. Church, 1 Caines' Rep. 196. This rule, however, cannot apply to an assured on a ship, who is owner of vessel and freight, which are not insured; Jumel v. Mar. Ins. Co., 1 Johns. Rep. 412, because he would be immediately liable in an action by the defendant for the amount of average due from the subjects uninsured.
For wages and provisions during an embargo laid on by the government of the country to which the vessel belongs, there is no contribution, as they fall exclusively on the freight. M-Bride v. Mar. Ins. Co., 1 Johns. Rep. 431. The law is the same as to the extra sum paid by a charterer by the month, during an embargo at a foreign port. Penny & Scribner, v. N. Y. Ins. Co. 3 Caines’ Rep. 155.

 But this rule does not hold when a vessel is sold at a port of necessity, In consequence of being unable to proceed on her voyage from injuries received by a peril of the sea; the amount of what she bona fide, sold for is then the value bn which to calculate her proportion. Bell v. Col. Ins. Co., 2 Johns. Rep. 98.