Duer, J.,
announced the decision of the court, and after stating the facts and the conclusions at which the court had arrived, he observed, that Mr. Justice Hoffman .had prepared an opinion, the result of their joint deliberations, in which these conclusions and the reasons upon which they were founded, were very fully stated. There was only a single question, he said, in relation to which he was not prepared, nor inclined, to assent to the views that were contained in the opinion of his brother, which, in all other respects, was to be regarded as that of the court. He was strongly inclined to the opinion, that the loss of the masts and spars that were cut away when they were actually on fire, and their destruction was certain, and their value wholly gone, and when it was only by cutting them away that the fire could be so reached, as to afford a hope that it could be extinguished, and the act was therefore a positive duty, and not a deliberate sacrifice, was a loss, not to be made good by a contribution, but to be borne exclusively by the owners of the ship and their insurers; in other words, was a particular, and not a general, average. He added, that such would probably have been his opinion, even if the cutting away of the masts and spars had been attended with that success in saving the vessel and cargo, which for a short time *410 seemed to follow it. Looking at all the facts of the case, he thought it very difficult to say that the cutting away of the masts, &c., created a loss at all; and still more so, that the loss, if any was created, was a fit subject for contribution, within any definition of a genera] average loss and general average contribution that had been given by any jurist, or adopted by any court. After an attentive consideration of the best authorities, he would venture to give what he deemed to be a true and full definition of the circumstances that give rise to a general average loss and contribution, and would say, that a loss, for which alone a general contribution may be justly claimed, is proved to exist, when it appears, that a deliberate sacrifice was made of the property of one person, with a view to the preservation, from a common and imminent peril, of the property of all engaged in the same adventure ; and when it also appears, that the effect of the’ sacrifice was to save the property of those required to contribute, from the destruction with which it was then threatened. This definition, he was convinced, although he did not think it then necessary to support his opinion by a quotation of the passages on which he relied, corresponded, substantially, with the views of Emerigon, Pothier, and Pardessus, and of Chancellor Kent, Arnould, and Phillips. The Judge then read a translation which he had made of an important passage from “ Benecke’s System of Marine Insurance,” as illustrating very clearly the reasons that had led to the inclination of his own mind, remarking, that in his judgment, the opinions of Benecke, upqn all questions in the law of insurance, involving practice as well as theory, from his long personal experience as a merchant and underwriter, in addition to his high qualifications and extensive learning as a jurist, were entitled to more weight and authority than those of any other elementary writer, foreign or domestic.*
The following is the passage that was cited:—
“ It is in all cases the duty of the master to exert his utmost diligence, and use all the means within his power, to rescue the ship and cargo entrusted to his care from a peril in which they are actually involved, and if while thus engaged, the sails or masts *411 are broken or destroyed, or the hull of the vessel injured, the damage is not a subject of compensation by a general average, for when the master has only done that which he was certainly bound to do, his acts are not the result of deliberation and choice. The case is still stronger, if the condition of the vessel, from the nature and action of the peril, was such, that without a voluntary destruction of a part, the destruction of the whole was certain and inevitable. Then it cannot be said, that there was any sacrifice of that which had already lost its entire value, and where there is no sacrifice, there is no loss, for which a contribution may be claimed.” (Benecke Sistema delle Assicur. vol. 4, p. 344.)
After reading this passage, the Judge observed that it was needless to point out the application of the remarks to the case before the court—it was obvious—but it was proper to add, that there was one circumstance by which the ease before them was peculiarly distinguished, not only from any reported, but from any supposed by text-writers. The cutting away, so far from being a sacrifice, of the masts and spars, was a measure for their preservation. So far from destroying any value which they then had, it was the only means by which any part of their original value could be restored and saved. It was unnecessary, however, (Mr. Justice Duer further said,) to decide whether the cutting away of the masts and spars was a voluntary sacrifice of property having value, since, if a sacrifice, as it had contributed in no degree to the preservation of vessel and cargo, it was not a subject for compensation by those who had derived no benefit from the act; and in this Mr. Justice Hoffman and himself were entirely agreed.
Hoffman, J.
The complaint presents the following case:— That on the 16th of December, 1853, John B. Kitching shipped on board of the vessel called the Great Republic, then lying in the port of New York, six hundred tierces of mess beef, of the value of $15,900, to be carried in and aboard of such ship from the port of New York to Liverpool, there to be delivered. The bills of lading were endorsed to the plaintiffs, and the right of Kitching in the beef transferred to them.
That on the 26th of December, 1853, the ship took fire, and was so badly damaged and burnt, that she was rendered incapable of sailing, and the voyage was abandoned. That the beef was dis *412 charged, from the ship, and delivered to the defendants, who, with the assent of all parties, became receivers of the cargo and ship, and of the proceeds of such parts as were proper to be sold, and were to pay over such proceeds to the parties who might be entitled.
That on the 1st of February, 1854, the defendants caused to be sold at public auction five hundred and ninety-five of such six hundred tierces of beef, and about the 13th of February, collected the proceeds thereof, viz.: the sum of $14,416.87; that they became liable to pay such amount, and were requested to do so, after deducting their reasonable commissions of $360.42, which they had refused.
The answer of the defendant states:—
That besides the beef of the plaintiffs shipped on board the vessel, there was a large cargo belonging to other persons, to be carried in like manner to Liverpool, according to the tenor of sundry bills of lading, excepting only the danger of the seas and fire. The breaking out of a fire in Front street, and its communication to the ship, is then stated, by which she and her cargo were put in imminent peril of destruction; and to preserve them, it became necessary to cut away the masts, which was done, and in doing which, other portions of the ship, and of the cargo in her, were necessarily greatly injured and damaged.
That by reason of the cutting away of the masts, and of the damage and loss necessarily occasioned thereby to other portions of the ship, and to the cargo, the said tierces of beef and other portions of the cargo laden on board, were saved and preserved ; and hence, that the plaintiffs became liable to contribute to the amount of such losses, damages, and expenses, voluntarily incurred as aforesaid, in a general average. That the plaintiffs had agreed, that so much as they might be thus responsible for should be retained out of the proceeds of the sales of the beef. Such sales had been made by the defendants, as general agents of all parties by consent, and amounted to the sum of $14,056.45, after deducting their commissions; and that the amount for which the defendants were liable, upon such general average, was the sum of $11,841.70—leaving a net balance due of $2,214.75, which the defendants offered to pay.
The cause was tried, before the Chief Justice and a jury, in March, 1855. A verdict was taken, by consent, in favor of the *413 plaintiffs, for the sum of $14,056.45, damages, and $1,500, for interest, “subject to the opinion of the court, at General Term, on the questions of law, arising upon the statement and adjustment of general average, and subject, also, to adjustment of the amount •of said verdict by the court, and with liberty, to either party, to turn the case into a bill of exceptions.”
Upon the trial, the counsel of the plaintiffs read the pleadings, and rested.
The counsel of the defendant then read a statement, purporting to be an adjustment of the general average, in the case of the ship Great Republic. It was agreed, and is so stated in the case, “ that the facts, and matters of fact, in the same, are to be taken as testified to, by the master and ofiicers of the ship having knowledge thereof, but no conclusions of law thereon are to be regarded.”
By the stipulation of counsel, at the hearing, this is to be considered as leaving the court to draw any conclusion of fact from the statement of the adjusters, as if from depositions of witnesses, whether such conclusions are consistent or inconsistent with those of the adjusters. Probably, this is the legal effect of the agreement stated in the case. Conclusions of law are, of course, left to be drawn by the court.
I think that it will tend to precision in understanding, and correctness in deciding, the case, that the facts be ascertained as they existed at two distinct periods:—one embracing the time between the discovery of the fire, and the time when, in the language of the finding, “ the fire on the deck was put out, and it was supposed the ship and cargo were savedand the other, from that period until the ship was raised from the bottom, to which she had been sunk, and the cargo was taken out.
I. About midnight, of the 26th of December, 1853, the ship was lying at the foot of Dover street, with nearly all her cargo on board, and her sails bent below the royals. The cargo consisted, chiefly, of wheat, flour, cotton, and rosin. A fire broke out in Front street, nearly in a line with the ship, as the wind was then blowing. The watchman awoke the second mate, with information of the fire, and that coals were falling about the ship. All hands were called, and stationed. Men were sent into the fore, main, and mizzen tops, with buckets.
The foresail soon burst into a flame. Attempts to beat out the *414 fire failed, and the men stationed in the foretop were driven out of it. The mizzen-topsail, and mizzen-topgallantsail had then taken fire. The crew attempted to extinguish this, and to cut the sails adrift from the yards. These efforts were vain, the dry cotton canvas soon being a sheet of flame. The firemen had, about this time, arrived, with their engines, but would not work on board, or near the ship, for fear of the blocks and other articles, on fire aloft, falling on them. It was then concluded, for the preservation of the ship and cargo, to cut away the mhsts.
At that time, the sails, spars and rigging at, and the heads of, the lower masts, were on fire. Ho material damage had been done to the spars by fire.
In executing this determination, the forestay and foretopmaststay were first cut away, and fell over the starboard-rail into the dock. The foretopmast broke short off, and fell down, endways, through three decks, being on fire at the time, and—as hereafter particularly noticed—set the cargo and lower part of the vessel on fire. The mainmast was next cut away, and, in falling, carried with it the mizzen and spanker masts, by the deck. The masts, spars, &c., in falling, crushed the boats, rails, &c., on the starboard side, and the houses on deck, broke the steam-engine, and did other damage. The houses, &c., on the upper deck, were all, more or less, on fire at the time.
After the masts, spars, &c., were cut away, the firemen came on board, with their hose, and finally succeeded in putting out the fire on deck, and it was supposed that the ship and cargo were saved; but all the houses, companion-ways on, and the upper deck, rails, &c., abaft the mainmast, were badly burned. The cabin in the upper between-decks, with all its furniture, the stem of the ship, rudder-heads, stores, spare sails, and a quantity of bread, in the upper between-decks, also perished.
It is also found, that the masts, spars, &c., cut away, were nearly destroyed, by fire, after they fell, on deck.
The fire, on and about the upper deck, being extinguished, several streams, of the engines, were removed to another fire, which had broken out in the city. After this, it was discovered that the cargo was on fire, in the lower between-decks, caused by the foretopmast falling through the decks, being on fire at the time. The subsequent measures were then taken, as hereafter noticed.
*415 1. The first question is this: Suppose the expectations entertained at this period, when some of the engines were carried off, had been realized, and the disaster arrested, would there not have been a case made, as to many items, for a general average ? The forestay, the foretopmast-stay, the mainmast, the mizzen and spanker masts, were voluntarily cut away; the heads only of the masts were on fire; they were destroyed after they fell, on deck: so the spars had received no material damage, and were burnt on deck. The boats, sails, &e., the steam-engine, and houses on deck, were injured directly by the cutting away of the masts. The evidence shows that these articles were, at the moment of the act of destruction, of an appreciable and considerable value. Had they fallen into the dock, and been reclaimed, they would certainly have yielded a considerable sum to the owners.
The general rule is, that the cutting away of masts, sails, boats, &e., is an ordinary subject of contribution. It is true, “that nothing but the presence of imminent danger will entitle the owner to make such a claim; and the sacrifice must, at least, be the apparent cause of extricating the ship from her perilous situation.” (Stevens on Average, p. 66; Bickley v. Pesgrave, 1 East. 220; Abbot on Shipping, p. 334, citing Marsham v. Dutry; Select Cases of Evidence, p. 58; Arnold’s Marine Insurance, § 327.)
But there is much authority to show, that the demand for contribution is not limited to cases where the voluntary act both commences and completes the destruction of the subject for which it is claimed. It extends to cases where accidental peril has begun, and the voluntary act has consummated, that destruction.
A distinguished French writer, M. Pardessus, discusses this subject, in a series of remarks of much pertinence to the present case. He states the two general rules: first, that when, by an ordinary peril of the sea, a mast is broken, a boat detached, or a leak disclosed, such accidents are matter of simple average, to be borne by the owner of the ship, and not subjects for contribution; and next, that if, during a storm, or a combat, it is found necessary, for the purpose of relieving the ship, or facilitating a manoeuvre, to cut away a mast, or make any other sacrifice, that must be considered as a case of common average.
He then proceeds: “ that, in combining these two rules, it results, that if a blast of wind had broken the mast, and then, for the safety *416 of the ship, it was necessary to complete the fracture, and cast it, with sails and rigging, into the sea, that last measure will form a case for common contribution, and the amount will be determined, according to the value of the mast and appendages, at the time of the breaking produced by the accident'. Before the determination to make the sacrifice, it was but a case of simple average.” (Art. 787, 738, Pardessus’ Droit Commercial, vol. 3.)
Emerigon states the same rule: “ It is particular average, if the mast is carried away by the force of the wind, without the concurrence of man. But if, the wind having broken the mast, the fracture is obliged tó be finished, and the mast thrown" into the sea, with sails and rigging, it is then a general average, for the value of the mast and accessories, in the state the whole was in when broken.” (Meredith’s Translation, p. 480.)
The case of the Red Lion, mentioned by Magens, (vol. 1, 181,) carries this doctrine as far as it, perhaps, will bear. It was an average, settled at Hamburgh. In a storm, the bowsprit, with the lower yard and sail, were broken to pieces, and carried overboard. By the rolling of the ship, the foremast, with the foretopmast, topgallant-mast-stay, shrouds, main-stay, main-topgallant-mast, with the whole set of sails, went overboard. Theyyrere all immediately cut away, to get quit of them, lest, by their working, the ship should go to the bottom. They cut, also, a maintop-stay in pieces, to cover and preserve the cables. They found it necessary to return to the Elbe, where, after some other disasters, they arrived. The ship was unloaded and repaired.
The Dispacheur adjusted the general average of these losses, in a manner which Magens approves. All the above items were brought into general average, except the maintop-stay.
The propositions, thus stated, are, indeed, to a considerable extent, contested, by both Mr. Stevens and Mr. Benecke, (pp. 67 and 111.) The latter admits of an exception, when the accident occurs in sight of port, which the vessel might have reached without cutting the rigging, and the measure is adopted to facilitate the manoeuvring, and give a better chance of preservation. The rigging cut away ought then to be allowed for. There would then be a sacrifice.
Mr, Phillips does not concur in the views of these writers. Mr. Arnduld states the rules in accordance with the foreign authorities, *417 (vol. 2, p. 894,) and in the case of Nickerson v. Tyson, (8 Mass. Rep. 467,) is in point, with the qualification, that the value to be paid for is only that of the masts and spars, after they were cast overboard, and were hanging by the sides of the vessel.
But now arises a point, the subject of no little discussion and difficulty. The masts and spars, it is insisted, must have been destroyed; for them there was no possibility of safety. When cut away, they were, indeed, of a considerable value; but that is not enough—the thing destroyed must have been in such a position as that there was a possibility of saving it, as well as of saving that for whose safety it was given up. What is certain of being destroyed, cannot be treated as of any value—cannot, therefore, be allowed for. It may be conceded that the masts, &c., were of value when cut away: that is, had a sudden flood of rain extinguished the fire, they would have been of value; but, as exposed, and under the actual circumstances, they were of no value. Their positive value only arose from their being cut away, and existed as to such only as fell overboard.
So distinguished a writer as Mr. Benecke gives this view the sanction of his authority. He says:—“ If the master’s situation was such, that, but for a voluntary destruction of a part of the vessel or her furniture, the whole would certainly and ¡unavoidably be lost, he cannot claim contribution; because a thing cannot be said to have been sacrificed which had already ceased to have any value.” (P. 283, London ed.) j
In commenting upon this subject, Mr. Phillips makes the fol-\ lowing remarks, (vol. 2, p. 66, ed. 1853.) “ The correctness of
this position admits of great doubt. It is inconsistent with cases of undisputed claim for contribution, as, for instance, composition with pirates. The more imminent the peril is, the less questionable seems to be the claim foruontribution on account of a sacrifice made to avoid it.” “ If, indeed, the thing abandoned is itself so exposed to destruction that it cannot possibly be retrieved and saved, and its abandonment cannot possibly contribute to the safety of the ship or crew, cargo or freight, there may be ground of objection to contribution. But in cases of such objection, the construction will be very liberal in favor of contribution.”
In the Columbian Insurance Co. v. Ashly, (13 Peters, 331,) the special verdict found, “ that the captain in this situation, finding *418 no possible means of saving the vessel or cargo, and preserving the crew, slipped his cables and ran the vessel ashore.” The ship was allowed for.
So in Bernard v. Adams, (10 Howard, 273,) the captain thought it impossible to get by a point without being wrecked and lost; he, therefore, directed the course of the vessel towards the shore. The ship was not utterly broken up; but it would cost more to get her off than she was worth. She was, therefore, sold.
Justice Grier presents the charge of the Judge as if thus made: “ That if the jury believed, that there was imminent peril of being driven on a rocky and dangerous coast, where the vessel would have been inevitably wrecked, with loss of ship, cargo, and crew, and that the immediate peril was avoided by stranding her at a less dangerous place, it was a case for contribution.” The learned Judge enters into a minute criticism of the phrase inevitable, and other expressions.
He states the proposition of the plaintiffs’ counsel thus:—“ If the common peril was of such a nature that the thing cast away to save the rest would have perished any how, even if not selected to suffer in place of the whole, there can be no contribution.” He then proceeds:—“ If this be the meaning, and we can discover no other, it is a denial of the whole doctrine upon which the claim for general average has its foundation.”
We cannot but observe that it is contrary to truth of reasoning, as well as to philology, to say, that a peril is inevitable in reference to the whole subject exposed to it, when the event shows that a portion of that subject escaped. The good sense, and the result of the two cases in the Supreme Court of the United States, seems to me this:—
A state of things may exist, and in those cases did exist, in which a certain and common destruction appeared inevitable, if nothing was done. But if an act was done, and it resulted in evading the peril as to part of the subjects exposed, but another part was lost in the act, the latter shall be allowed for; and this, although the peril incurred as to that part was just as sure of leading to its destruction, as the peril to which it was originally exposed.
Let the case of the Hope, and that of the Brutus, be tested by the rule advocated by Mr. Benecke. The vessel was, according *419 to the best judgment that existed in the case, certain of being utterly lost. She was then, at the moment of the act determined upon, of no Yalue. But the act of stranding her in another place, while it brought no greater or other peril to herself, was the means of saving the cargo; and, for that preservation, the cargo contributed to meet her loss.
This reasoning derived from these decisions, seems to me irresistible, upon the hypothesis of success now presented. The masts and spars were cut away to enable the firemen to come on board, and to use the most, if not the only effectual measures, to avert the danger. They succeeded in extinguishing the fire, so that entire success was apparently the consequence of the act. The masts and spars were of considerable value at the moment of their premeditated destruction, as well as the ship Hope at the moment before her stranding. Every element in Mr. Justice Grier’s propositions, as to what makes a case of general average, is included here. There was a common danger, in which all participated—a danger, apparently, inevitable to all, if no act of man averted it. There was a transfer of this imminent peril, from the whole to a portion of the whole. The act was eminently calculated to preserve the residue of what was exposed, and seemed, for a time, to have done so.
I apprehend then, that although a fortuitous cause has begun the work of destruction of part of a ship—if a voluntary act completes it, and that act averts or diminishes the damage to the cargo and rest of the ship, there is ground for contribution; and that this rule is equally applicable, whether it is certain that the' fortuitous cause would have destroyed that portion if left alone, or not.
My own examination has thus led to the conclusion, that in the present case the damage to the masts, spars, railing, and some other articles, would have proved a case for general average, had the result of cutting them away been finally successful. But my associate, Mr. Justice Duer, is much inclined to a different view of the point; and I may well distrust my own conclusions, when they do not meet the approval of one who has made commercial law the subject of such extended and profound examination. Still, the propositions of the adjusters, and the points argued by conn *420 sel, have made it proper to discuss and express my opinion upon the subject.
It happily does not become essential to decide this question, in consequence of the conclusions we have arrived at upon another point, which I now proceed to state.
2. I have before noticed the rapid progress of the flames, and the unavailing efforts of the crew to arrest them—the arrival of the engines, and the circumstances which, for a short period, rendered their arrival useless. The blocks and other articles, which were falling from aloft upon the deck, menaced the firemen with a needless peril, and they refused to board the ship, unless the masts were cut away. The moment this was done, their labors were bestowed, and were effectual. The whole peril appeared, for an interval, subdued and averted—success seemed to have rewarded the efforts of those engaged, and preservation to have been won when the sacrifice was consummated,
But these hopes and expectations were illusory. The interval. of apparent security was the period of the most imminent and fearful peril. All the measures adopted for safety proved sources of destruction. The triumph of energy and skill was momentary, and even for that moment delusive.
Sed non idcirco flammas atque incendia vires Indómitas posuere; udo sub robore vivit Stupa, vomens tardum fumum; lentusque carinam Est vapor.-
II. This unfortunate result brings us to the consideration of the facts attending the second period of the accident; and it is necessary to understand these facts and circumstances, with regard to two points of the case.
First. Whether they displace the apparent right to a contribution for the masts, &c., cut away, assuming such a right to have existed.
Next, (and of far more importance,) Whether they give a foundation to the claim for contribution for nearly two-thirds of the original value of the ship, and for about one half of the cargo, as well as for the freight.
And this last question is to be examined, also, in connection with all the facts from the commencement to the end of the disaster.
*421 It is found, that after the fire on and about the upper deck had been extinguished, and several engines had been removed to attend a fire in another part of the city, it was discovered, that the ship and her cargo were on fire in the lower between-decks, caused by the foretopmast falling down through the decks, (it being on fire at the time,) and thus setting the cargo and the ship in the lower between-decks on fire. When discovered, the fire had such headway that all attempts to extinguish it from above were soon found to be fruitless; and the ship was, therefore, scuttled in three separate places, and soon sunk down ten feet, when she struck the bottom. Every effort to put out the fire was ineffectual, and the ship burned for two days, when, being burned to the water’s edge from aft to about the foremast, it was extinguished. The cargo was burned badly in the second and third between-decks; but that in the lower hold was only damaged by water.
Up to the time of cutting the masts away, the cargo had sustained no damage by either fire or water; nor was it damaged by the water thrown in, or on the ship, to extinguish the flames on the upper and in the upper between-decks; and not until the fire was discovered below, caused by the falling of the foretopmast through the decks, did it sustain any damage, by either fire or water.
The grain in the lower hold had swelled so as to break the knees and beams of the lower deck, and otherwise badly strain and injure the ship.
The vessel was afterwards floated—the cargo taken out, and the ship condemned and sold.
1. The first question is as to the effect of these events upon the right to contribution for the masts, ¿ce., cut away, supposing it to have been otherwise due.
I consider the true rule to be, that the achievement of the object \ designed, even for a very short period of time, will be sufficient j to justify contribution notwithstanding a subsequent loss, provided// the ultimate loss results from a new peril.
Emerigon states the case of a jettison saving the vessel, which is then wrecked in another place. Yet for the time, she had been saved by means of the jettison, and what is ultimately preserved should make it good. (Emerigon, 476, Meredith’s edition.)
Valin, however, observes, that if the effect is only to comfort *422 the ship—if the storm recommences, though after some hours of interruption or diminution, and the vessel is lost, though several days after the jettison, there is no contribution, (cited ibid.) If the jettison and shipwreck (says Pothier) are caused by the same tempest, the effects saved shall not contribute to those thrown into the sea. (Pothier, Ho. 114.) M. Rogron, in his Code Francais Expliqué, (Paris, 1855,) in his comment upon article 423 of the Code of Commerce, lays down the same rule.
' Pardessus presents, as the rule of the French Law, this proposition :—“ That if once the danger for which the sacrifice had been made is avoided—for example, that the tempest is ended, or the ship has escaped from the enemy, even if it is for a slight interval—contribution is due. The important point is, not to confound the continuation of the same accident, though after an interval, with a new accident. If the things saved meet, afterwards, with new injuries, those subsequent events, independent of the first, (though they may be extremely close to them,) do not prevent that the things which escaped, more or less injured by the new accident, and come to port, should pay the first debt. The goods, thus subsequently damaged, contribute according to their real value at the time and place when contribution is adjusted. If they have perished in the voyage, though in consequence of a subsequent event, the owners are not held liable.” (Art. 743.)
The case of Walker v. The United States Insurance Company, (11 Serg. & Rawle, 61,) and the case of Lewis v. Williams, in this court, (1 Hall’s Rep. 4^0,) sustain the principles thus advocated. The reasoning of Chief Justice Jones, and of Mr. Justice Oakley, is clear and decisive upon the point. And the case of Scudder v. Bradford, (14 Mass. Rep. 13,) appears to me perfectly consistent with these authorities and decisions.
Thus the question is, was the peril which rendered the sacrifice useless, a continuation of the same peril which led to it, or was it a new disaster?. The fire, which induced the act of destruction, was transferred, with the blazing spar, from above to the hold below, and there continued and spread itself. It seems difficult to say that this was different from the continuation of the same tempest, which, by rendering the sacrifice fruitless, displaces a claim to contribution; and it follows, that no claim exists in the present *423 case for that damage which, though caused by a voluntary act, did not, in reality, avert or diminish the peril.
2. I come next to the consideration of that important part of the cause which relates to the almost total destruction of the vessel, and of about half the cargo, for which contribution is sought.
The general features of this interesting part of the case are these:—That the original or primary cause of the loss was an accident not the subject of general average: that a proximate cause of the preservation of the hull and cargo was the scuttling of the ship; that the immediate cause of the scuttling was a fire in the hold and between the lower decks of the vessel; that such fire was brought there by a voluntary act of destruction; and that such voluntary act, instead of averting the peril it was intended to prevent, was an actuad and efficient agent of the loss that ensued. The primary and accidental cause of the disaster was transferred from one part of the ship to another. It became a continuation of that original cause; a transmission of it, in its full and unintermitted character, to the vessel and cargo.
Had no measures been taken to arrest the flames, the vessel and cargo would have been destroyed. Had the scuttling not taken place, the same identical results would have ensued; and ensued not merely in spite of the voluntary act, but as its direct and immediate consequence. Had the vessel been left unscuttled, a heavy gale of wind, and dash of the wave might have preserved some portions of her hull and of the cargo. Would it have been possible to sustain a claim for contribution under such circumstances ?
There are cases where contribution has been compelled for sacrifices honestly made, although a severe inquiry might have left it questionable whether they were essential to the preservation which ensued. But to award contribution for a voluntary act which directly led to the destruction, or which, at least, did not for a moment interrupt the progress of the original cause of the disaster—and when that cause was fortuitous—seems unsanctioned by principle or authority.
The essential constituents of a case of contribution are, that the intelligence, the will, and the act of man, have intended and produced the sacrifice of the thing for which compensation is sought, *424 and have worked, in whole or in part, the preservation of the property from which it is claimed. The subjects destroyed must have been, in the contemplation of the party, as things to be destroyed. This rule admits, indeed, of a few guarded exceptions, but none which may not be considered, in the ordinary course of events, as comprehended within the intention. The cutting away of masts is probably as often accompanied with damage to boats and railings as otherwise, and may well be assumed to have been . an expected consequence. The leak, as in the case of Magrath v. Church, (1 Caines’ Reports, 214,) may reasonably be anticipated as a probable result of the splintering of masts when cut away.
With such exceptions, I apprehend the pervading principle of contribution is such as I have stated. There must be the intent to sacrifice the thing designated. The sacrifice must be accomplished. Some definite advantage must have sprung from it. A final preservation must ensue, not indeed by a logical necessity directly and solely from the sacrifice, but as reasonably contributed to by it, or as consistent with it, as with any hypothesis the circumstances will allow.
It appears to me that this principle will be found more discernible than any other, in all the great leading authorities in which a claim for general average has been sustained.
The important and contested cases of stranding, even accompanied with a total loss, rest upon this proposition. Take the case of The Hope, in the Supreme Court of the United States, (13 Peters, 331.) The vessel was surrounded with dangers. She had begun to strike upon the shoals, and her head swinging round, she was brought broadside to the sea. The captain slipped his cables, and ran her ashore, where she was totally lost. That act was designed to peril the ship, and did in fact wreck her. A definite advantage in changing the location resulted. The preservation of the cargo might reasonably be attributed to it. It is too speculative to say that the ship must have been lost elsewhere, or that the cargo might possibly have been saved elsewhere. An act was done with the certainty of its entailing a loss to the vessel, which may have been less than total, but which was apparently inevitable; and it did tend to save the cargo. It was done as an act hazardous to both, but to avoid a more certain and greater *425 peril. Bernard v. Adams, (10 Howard, 373,) is strongly to the same effect.
We may trace the same principle in the cases upon the question whether the cost of the repairs of a vessel, and the expenses of her delay, upon a deviation into a port of necessity, are to be allowed as general average or not. On this subject M. Pardessus concludes that all the expenses attending the delay, {reláche,) such as wages and provisions, are items of this description; but not the cost of the repairs of the vessel, occasioned by the marine disaster. As to these, the deliberation which has decided the intention, does not change the character of the previous accident. (Art. 741, vol. 3, p. 228.)
On the contrary, another late French author, in a very elaborate discussion, after critically weighing the language of the 400th and 403d articles of the Code of Commerce, decides, that all the expenses attendant upon such a deviation and delay should be classed among simple averages. (Lemonnier Assurance Maritime, vol. 2, p. 107, 113; Paris, 1843.)
M. Emerigon defends the position of Pardessus. Boulay Paty, his editor, that of Lemonnier. (Ib. p. 113, note 5.)
But the French authorities observe a distinction. If the tern-pest has-compelled the cutting away of masts, or such dismantling of the vessel as to render the prosecution of her voyage impossible or difficult, the resort to the port of refuge is a consequence of the voluntary act, and shall be attended with similar results, The expenses and repairs are subjects of general average.
With this distinction, the English courts have adopted the more rigorous and more logical rule advocated by M. Lemonnier. Power v. Whitmore, (4 Maule & Selwyn, 141,) appears to have thus settled the law, and so it is considered by Mr. Amould in his judicious observations upon that and the case of Plummer v. Wildman, (2 Arnould, 298.)
A different rule prevails in our own state, and in many of the other states. The cases are referred to in 2 Phillips on Insurance, 120, &c.; to which may be added Potter v. The Ocean Ins. Co., (3 Sumner, 77.) The wages, provisions, and expenses in a port of necessity, constitute a claim for general average. And this rule is established without reference to whether the original cause of the resort to the port of necessity was one of a fortuitous charac *426 ter, or from a voluntary act of sacrifice. But as a general rule, the repairs of the vessel are not allowed.
The determination—the forced volition, which compels the captain to resort to the port, is a determination to incur the loss of the provisions, the extra wages, and incidental expenses; and it is as much a species of sacrifice as the destruction of a mast. It is intentionally incurred. The expenses and losses are such as-must enter into the contemplation of the party. They are the natural, the inevitable fruits of the decision.
And thus we see that in whatever form the rule is found—■ whether in the rigorous sense of Lemonnier and of the English courts, or in the more expanded one of our own decisions—the principle adverted to may be traced in its full influence. There is what is equivalent to a premeditated sacrifice of the distinct subjects—the fulfilment of the intent, and a consequent benefit to what is called upon for compensation.
The cases of ransom from pirates, whether by giving up portions of the cargo, or by bills, furnish the same rules. Not only the price paid, but the wages of the hostage, are intentionally incurred, definitely contemplated, and plainly resulting in the common good. (Emerigon, ibid. 877, and the case of the Vierge de Cadera, ibid. 377,)
So the expenses and wages incurred after capture and a successful attempt to reclaim the property, have the same characteristics. (Arnould, p. 2,912. Leavenworth v. Delafield, 1 Caines, 573.)
If such is the ruling principle to be found in the law upon this subject, the present case, in the view now considered, cannot admit of doubt. The destruction- contemplated was of the masts and spars, and the ordinary consequential damage. The vessel and each part of the cargo was meant to be saved, not sacrificed. What was designedly given up was uselessly surrendered, and what it was meant to preserve was destroyed by the very act of sacrifice.
We are brought, then, to the consideration of the next material act of the agency of man in this catastrophe, viz., the effect of the scuttling. It will be remembered that the ship, when scuttled, sank down ten feet, when she struck the bottom.
What, then, was the effect of the scuttling? Let it be conceded that all that was preserved of cargo or vessel was saved by this *427 act. Let the utmost force be yielded to the argument of counsel, that, as the vessel was lightened by the progress of the fire, she would gradually have risen, to meet, as it were, the fatal embrace of the flames. She would then have burnt lower, and, for a considerable part of the ten feet, which, by the scuttling, was submerged. And thus, the ten feet of frame, and the principal portion of the cargo rescued, owed their safety to this deed.
Still the important and decisive question remains:—What part of the ship was destroyed by the scuttling ? It is indispensable, in conformity with the principles before stated, that such destruction should be directly traced to the scuttling, and an appreciation of it,be possible.
The flames continued for two days, and burnt the vessel to the water’s edge, from aft to near the foremast; and no part of the damage can, upon the finding, be attributed to the scuttling, except the breaking of the knees and beams of the lower deck, and the strain and injury arising from the swelling of the grain in the lower hold.
And as to the cargo, that in the lower hold was only damaged by the water. All the rest was chiefly, if not solely, injured by the fire.
The question appears to be reduced to this,—Shall the amount ■of injury to the ship, and damage to the cargo, which can be definitely traced to the scuttling, be brought into general average ?
We have been referred to Crockett v. Dodge, (3 Fairfield’s Reports, 190,) as bearing upon this part of the case. It has been much criticized; and the language of Justice Story, in 13 Peters, 331, is quoted as decidedly contradictory to it. But in that case, the owners of a cargo of lime asked contribution from the owners of the vessel. The cargo was on fire from spontaneous combustion. The vessel was, after first resorting to some other measures, hauled from the wharf, and scuttled; by which the lime became of no value, and the vessel was preserved. It was held that contribution could not be allowed, if there was no possibility of saving the lime when the act of scuttling took place.
We apprehend that this decision may be best placed upon a settled rule of law, that no contribution can be claimed for a loss of cargo which is damaged by its own proper vice.
Mr. Benecke, (Benecke & Stevens, p. 13, Boston edition, 1853,) *428 says—an injury ascribable to the quality of the goods ought never to prejudice the rest of the shippers, or the ship-owners.
In the Dictionnaire De Droit Commercial, of Grousset & Meiger, (Paris, 1852, vol. 1, p. 53,) it is stated, that if the loss results from the proper vice of the article, the owner must bear the consequences. Delaborde, p. 40, is cited for the proposition. Roccus states the same rule. (Ingersoll’s Translation, 83.) And Boulay Paty, in his edition of Emerigon, (Paris, 1827,) declares, also, that a loss arising from the proper vice of the cargo is matter of simple average, (§ 433,) and the same rule is fully established in the English law and in our own, (2 Arnould, 758, § 282; 1 PMllips, 627.) V
The two articles of the Code of Commerce seem explicit to this point. The like rule was applied in the case of Bond v. The Superb, (Wallace, Jr., Rep. 355.)
But the present case is different. The fire was fortuitous. We may treat it precisely as if it had originated by accident in the between-decks. The scuttling necessarily brought a direct and immediate damage to the cargo in the lower hold—the grain, it is presumed. It brought it intentionally. It was certainly to be anticipated that a damage to that article of the cargo would result. It preserved, in a damaged state, a part of that article, and it preserved whatever of the residue of the cargo was saved, and that relic of the vessel which was raised.
Mr. Benecke, (page 165,) says:—“ If sacrifices be made, in order to extinguish the fire, (occasioned by lightning, intrinsic quality, or other accidental causes)—if masts, or cables, for example, be cut away, or the vessel be run ashore—I am of opinion that the damage ought to be general average, although an instance of a decision to the contrary is quoted by Emerigon.”
He proceeds:—“If water be thrown down the hatches to stop the progress of an accidental fire in the hold, or between decks, this must be conceived to be done with the double intention, of saving the articles which have already caught fire, from utter destruction, and of extricating the vessel and rest of the cargo from an imminent danger. The effect of the water upon the former goods is, therefore, particular average. It is not an injury, but a real advantage to them. But the damage done by the .water is, I conceive, of the nature of a general average.”
*429 He quotes the Ordinance of Bilboa, that when a vessel catches fire in the harbor, and an adjoining vessel is sunk, in order to save the others, the damage must be made good by the contribution from all the other ships and cargoes.
It appears to us that the direct damage done to the cargo in the lower hold, by the scuttling, is a proper subject for contribution'.
We presume it can be arrived at, by a comparison of the invoices of the grain there stowed, and the proceeds of the sale of such grain.
Ho damage to the articles of the cargo which were between decks, and on fire, arising from the water thrown in, is to be contributed for. The fire is to be considered as still an accidental fire.
And we think that the damage to the knees and timbers, re-suiting from the swelling of the grain in the lower hold, which directly sprung from the scuttling, is to be allowed. What would it have cost to repair that specific injury ? This, we suppose, the adjusters can, without difficulty, ascertain, and with reasonable precision. '
III. It is next necessary to state what rules of valuation are • applicable to the sxibjects which are to be allowed for, and those which are to contribute.
1. The amount to be allowed for the ship, is that sum which the adjusters shall be able to say arose, definitely, from the injury to the knees and beams of the lower deck, and the strain to the ship, produced by the swelling of the grain in the lower hold.
The ship is to contribute upon the proceeds of the sales of her Hull and materials, to which is to be added that amount which the adjusters shall ascertain ought to be allowed for injxiry to the knees, &c., as above stated. (Dodge v. The United Insurance Co., 17 Mass., 475; 2 Phillips on Ins. 137, 4 edition; Pardessus, art. 748.)
2. The damage to the cargo to be allowed for, is to be 'ascertained by a comparison of the proceeds of the sales with the invoice cost.
The ordinary rule, in a case of jettison, is to take the value at the port of destination, and to allow that value, as well as to fix the amount of contribution upon the same basis for what is saved. (2 Phillips, 4 ed. p. 132.) Where sales of damaged goods have been made, the difference between the sales and the valuation, if *430 sound, is the amount to be allowed. (Magens’ case xxv. vol. 1, p. 293.) If goods are sold at the place to which the apportionment relates, the amount of the proceeds is the basis on which their contributory value is fixed, (2 Phillips, 151, ed. 1854,) and goods are contributed for at the same rate, and on the same basis as goods contribute. (Ibid. p. 132.)
In a case like the present, where the voyage has not commenced, and the goods were recently shipped, their value may properly be tested by the invoices; and the sales of the goods, at the same port of shipment, may be taken as evidence of their value after the disaster. The difference is the damage to be allowed. The difference between the invoice and the sales is $45,409.38. This is to be contributed.
3. The next question is, On what basis is the residue of the cargo to contribute ? The ordinary rule is, that, in cases of jettison, the cargo is to contribute upon the value of the goods, estimated at their prime cost or original value; or, if the vessel has arrived at her port of destination, at their value at such port. (Rogers v. The Mechanics' Insurance Co., 2 Story’s Rep. 173.)
Mr. Abbott states, (347,) that if the ship, in consequence of any .misfortune to be sustained by general average, be compelled to return to its loading port, and the average be immediately adjusted, in that case, the goods only contribute according to the invoice prices, for the price of sale is unknown.
In the Mutual Insurance Co. v. The Cargo of the George, (8 Law. Rep. 361,) the ship was stranded, and unable to return to the port of departure, or to adopt an intermediate port. The vessel was lost, and a greater part of the cargo saved.
The cargo was adjudged to contribute, at the prices stated in the invoices and bills of lading, deducting therefrom salvage, and other necessary expenses, incurred in consequence of the wreck.
But, in these instances, the value of the cargo, as preserved, was to be arrived at; it being a fixed rule, that a subject is to pay according to its value, as it exists, when called on to contribute. But, in the present case, all the cargo was, to some extent, injured. All that was preserved was sold. The prices may be taken as a fair test of the value of what was saved.
We may add, that in the present case, the consent of all the parties interested, to a sale of all the cargo, renders this mode of *431 adjusting the basis of contribution proper, even if another would, in. ordinary cases, be more regular.
4th. In this connection, another question arises. It is a general rule, that the goods, or articles, sacrificed and allowed for, are made to contribute in common with those saved.
If merchandise is thrown overboard, worth $1,000, and the residue of the cargo, and the vessel, are valued at $10,000, it is plain that, if the owners of the latter pay the whole $1,000, the owner of the goods jettisoned loses nothing. It is, however, a fundamental principle, that he is to be dealt with precisely as if the goods of another had been sacrificed. Hence, he pays with the others; and the contributory interests, in the case stated, are $11,000, instead of $10,000, or 9.09 per cent., instead of 10 per cent.
In the present instance, on the assumption that only the grain in the lower hold was damaged by the scuttling, and therefore the subject of a general average, the loss was $45,409.38.
The owners of this grain pay, of course, their proportionate amount of the proceeds of - the sales of" what was saved. But if they pay nothing upon the amount contributed to them, they would receive from others the whole $45,409—in other words, would get the whole value of the goods thus lost to them. They should pay the same percentage on what they get, as the owners of the other portions of the cargo pay upon what they receive.
We, therefore, add to the value of the cargo which is to contribute, the amount of the loss which is to be paid to the owners of that part of the cargo allowed for. >
5th.- The next question is, whether the freight should be contributed for. The voyage was broken up: the voyage cannot be said, indeed, to have commenced. The contracts of the affreightment were at an end. Hot a dollar of freight had been earned. How can it be treated as sacrificed? The ship is not allowed for. Its accessory, the freight, cannot be.
It is true, there was a total loss of the ship, which occasioned the breaking up of the voyage, and a consequent loss of the freight; but the total loss of the ship was a particular, not a general average. It was produced by the fire, not by the scuttling, to which alone the general average, as its proximate cause, is attributed. Had the' ship sustained no injury but from the scuttling, as she might have been repaired at a moderate expense, the voyage, we are *432 bound to believe, would have been resumed, and the freight earned.
When freight was allowed in the Columbian Insurance Co. v. Ashley, (13 Peters, 364,) it was because the ship was allowed for. It was lost, as well as the ship, by the sacrifice for the common good. And when freight pro rala itineris (that is, the freight which had been earned at the time of the disaster) was allowed in Gray v. Walker, (2 Serg. & Rawle, 229,) the ship was also a subject of general average.
To allow freight in this case would be, in effect, to make contributors in general average insurers of the freight.
It follows, that if freight is not to be allowed for, it is not to contribute.
6th. There is a large amount of expenses carried into general average, which might require some apportionment, upon the principles of this decision. We have supposed, from the course of the argument, that we were not called upon to enter upon this point. But if we were mistaken, it is, of course, open for consideration.
The result is, that the adjustment must be revised upon the principles stated. An order referring the case to the adjusters, as referees, may be entered, to be settled by one of the Judges.
Campbell, J., concurred in the decision, but declined to express an opinion upon the question upon which his brethren differed.
The following schedule, prepared by Justice Hoffman, may be useful to show the application of the rules stated, upon hypothetical amounts:—
No. 1.
RECAPITULATION OF PREVIOUS STATEMENTS IN DETAIL.

*433

No. 2.

To be contributed for.

Loss on cargo by scuttling, (corn and wheat,) . . . $45,409 38
Damage to vessel by scuttling, say, hypothetically, . 5,000 00
Expenses of general average, by Grinnell & Minturn, as stated in settlement,.......... 29,957 75
Johnson & Higgins, expenses of adjustment, . . . 1,835 00
Amount to be contributed,........$82,102 13
No. 3.

Subjects to contribute.

Vessel—Hypothetical damage, as above, $ 5,000 00
Materials sold,........ 2,468 90
Hull, &c., sold,........ 28,078 38
-$35,547 28
Cargo, on amount of sales, .... $113,287 49
Loss on the grain, &c., to be contributed for, per Statement No. 1, .... 45,409 38
' 158,696 87
$194,244 15
$194,244.15, $82,102.13—say 42| per cent.
Beef in question,............$14,416 87
42^ per cent,,............. 6,093 13
Balance,..............$8,323 74
On Etchings’ wheat,........... 4,968 00
42J per cent.,.............2,101 48
Balance, 1,866 52
Note.—The case was settled, by the parties, upon a readjustment made under the rules declared by the court.

 Vide, as to the character of Benecke and his writings, 1 Ducr, on Insurance, second Introductory Lecture-, pp. 48, 49.